IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WESLEY B. TANKSLEY,

        Plaintiff,

v.

RICE COUNTY SHERIFF'S OFFICE
and BRYANT EVANS,

        Defendants.

Case No. 19-1342-DDC-TJJ

## MEMORANDUM AND ORDER

Currently before the court are several pending motions from both plaintiff and defendants. The main event is defendants' Motion to Dismiss (Doc. 11), which they've supported with a Memorandum in Support (Doc. 12). Then there's plaintiff's Motion for Leave to File Second Amended Complaint and to Substitute Party (Doc. 27). On top of that, plaintiff also filed a Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 34). For each of these matters, the parties engaged in motions practice—filings responses and replies.[1] *See* Docs. 26, 31, 32, 36, 37. Now, the court is ready to rule all of these motions.

For reasons explained below, the court concludes plaintiff fails to state a claim for relief under 42 U.S.C. § 1983, the United States Constitution, and Kansas law. Accordingly, and under

---

[1]     The court should note one wrinkle to this detail. On June 27, 2020, plaintiff filed his Motion for Leave to File Second Amended Complaint and to Substitute Party (Doc. 27). Defendants responded in opposition (Doc. 32). Plaintiff could've filed—but didn't—a Reply in response to defendants' arguments. *See* D. Kan. Rule 7.1(c) ("The moving party may file and serve a written reply brief or memorandum."). So, the court has plaintiff's motion and nothing more to consider against defendants' Response.

Fed. R. Civ. P. 12(b)(6), the court grants defendants' Motion to Dismiss (Doc. 11) and dismisses plaintiff's federal and state law claims with prejudice.[2]

These conclusions involve another important finding:  that plaintiff's efforts would prove futile, even if granted leave to file a second amended complaint.  *See* Doc. 27.  The court thus denies his Motion for Leave to File Second Amended Complaint and to Substitute Party (Doc. 27).  Likewise, the court finds no need to certify questions to the Kansas Supreme Court.  *See* Doc. 34.  Thus the court denies plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 34).

The court explains its rulings in greater detail, below.  But first, a bit of background will help.

## I.     **Factual and Procedural Background**

### A.  **Factual Background**

The following facts are taken from the allegations in plaintiff's Amended Complaint (Doc. 5).  The court views them in the light most favorable to plaintiff, as required by *SEC v. Shields*.  744 F.3d 633, 640 (10th Cir. 2014) ("We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]." (citation and internal quotation marks omitted)).  In other words, and up against defendants' Motion to Dismiss, the court is required to recount these facts according to what plaintiff alleges in his Amended Complaint.  *See Cid v. Bd. of Cnty. Comm'rs of Riley Cnty., Kan.*, No. 18-4012-DDC-KGS, 2019 WL 161495, at *5 (D. Kan. Jan. 9, 2019) ("When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true." (citations omitted)).

---

[2]      In this case, the court will exercise its discretion to invoke supplemental jurisdiction over plaintiff's state law claims, under 28 U.S.C. § 1367.

Beginning in February of 2017 and until January the following year, plaintiff worked as a deputy with the Rice County Sheriff's Office.  Doc. 5 at 2 (Am. Compl. ¶¶ 7–8).  In his capacity as a deputy for the Sheriff's Office, plaintiff served under named defendant, Sheriff Bryant Evans.  *See id.* (Am. Compl. ¶ 8) (explaining Sheriff Evans both hired and fired plaintiff from his position).  In addition to Sheriff Evans, "[o]thers in Deputy Tanksley's chain of command included the Undersheriff, Chad Murphy."  *Id.* (Am. Compl. ¶ 9).

About five months into his employment—that is, in July of 2017—plaintiff raised the first of three "reports" to Sheriff Evans about workplace practices and plaintiff's concerns over those practices.  *Id.* (Am. Compl. ¶ 11); *see also id.* at 3, 4 (Am. Compl. ¶¶ 21, 27).

### 1.  Plaintiff's First Report and Related Retaliation

During a meeting with Sheriff Evans in the summer of 2017, plaintiff reported two distinct concerns.  *Id.* at 2–3 (Am. Compl. ¶¶ 11–15).  *First*, he told Sheriff Evans that "other deputies were using their county patrol vehicles to work for a private security company owned by Undersheriff Murphy."  *Id.* at 2 (Am. Compl. ¶ 11).  These deputies, he said, were sometimes "on duty and in uniform for the Sheriff's Office while working for the private security company."  *Id.* (Am. Compl. ¶ 12).  *Second*, plaintiff reported to Sheriff Evans that another deputy "was double-billing his time for the City of [Geneseo] and for the Sheriff's Office" while attending meetings of the Geneseo City Council.  *Id.* (Am. Comp. ¶ 13).  Upon learning this information, "Sheriff Evans responded by telling Deputy Tanksley that he would speak with Undersheriff Murphy about the matter."  *Id.* (Am. Comp. ¶ 14).

Later that month, and in "retaliation for the first report," Sheriff Evans "verbally counseled Deputy Tanksley about his tone in [emails] and about needing to be accountable for his actions."  *Id.* at 3 (Am. Compl. ¶ 16).  The following month, in "further retaliation for the

first report," Sheriff Evans "issued a verbal reprimand to Deputy Tanksley for making changes to his time sheet after the deadline for when time sheets were to be submitted." *Id.* (Am. Compl. ¶ 17). That same month, and again in "further retaliation" for this first report, "Sheriff Evans issued a written warning to Deputy Tanksley," and "placed [him] on 90 days' probation[.]" *Id.* (Am. Compl. ¶ 18).

The written warning touched three issues. *Id.* (Am. Compl. ¶ 20). *First*, Sheriff Evans recorded his concern "that he had heard from sources that [plaintiff] Tanksley had told them that he refused to follow directives or procedures set by the Sheriff or Undersheriff, such as wearing his Taser in a cross-draw position[.]" *Id.* *Second*, Sheriff Evans raised a concern that plaintiff "had made allegations that someone in the Sheriff's Office had been changing his reports to make him look bad[.]" *Id.* And *third*, Sheriff Evans's written warning explained, "Sheriff Evans had received a phone call from a crime victim's father stating that Deputy Tanksley had failed to make contact with the victim during an investigation." *Id.*

### 2. Plaintiff's Second Report

In December 2017, plaintiff approached Sheriff Evans again—this time to discuss "a second report." *Id.* (Am. Compl. ¶ 21). Plaintiff reported to Sheriff Evans that Undersheriff Murphy's 19-year-old son, who was employed "as a Jailer" for the county's jail, "had also been carrying a concealed handgun." *Id.* (Am. Compl. ¶¶ 21–22). The handgun "was property of the Sheriff's Office and was issued to [the individual] with the consent of Sheriff Evans." *Id.* at 4 (Am. Compl. ¶ 23).

Plaintiff's Amended Complaint alleges this conduct by the Undersheriff's son violated Kansas state law. *Id.* (Am. Compl. ¶¶ 24–25) (alleging that state law would've required this individual to secure, first, a license to carry the concealed firearm, which would've been

impossible because, under an adjacent state law, the individual "could not have obtained such a license . . . because he was less than twenty-one years of age"). But, the Amended Complaint doesn't allege that plaintiff referenced either statute when speaking with Sheriff Evans. *See id.* at 3–4 (Am. Compl. ¶¶ 21–26). Regardless, "Sheriff Evans' reaction was to defensively tell Tanksley, 'Ok, ok, ok' which meant to Tanksley that Evans viewed his report as a challenge to Evans' authority." *Id.* at 4 (Am. Compl. ¶ 26).

### 3. Plaintiff's Third Report and Related Retaliation

Plaintiff spoke with Sheriff Evans about workplace concerns again in January 2019. *Id.* (Am. Compl. ¶ 27). At some point not long before then, "Tanksley arrested or detained an individual for an outstanding warrant[.]" *Id.* But, "the same individual had been arrested the previous night on the same arrest warrant." *Id.* However, the "deputy who had made the earlier arrest did not make a report of the arrest." *Id.* (Am. Compl. ¶ 28). "Thus, Tanksley did not know the individual had been arrested the previous night at the time he made the arrest or detention." *Id.* (Am. Compl. ¶ 29).

So, "Tanksley reported to Undersheriff Murphy that day that an officer who makes an arrest should prepare and enter an Arrest Report into the Sheriff's Office computer system." *Id.* (Am. Compl. ¶ 31). Specifically, plaintiff identified Sheriff Evans and two deputies as the individuals "who needed to follow this procedure." *Id.* at 4–5 (Am. Compl. ¶ 33). And, "Tanksley suggested that the Sheriff's Office needed to train the deputies and Sheriff Evans to write such reports." *Id.* at 5 (Am. Compl. ¶ 34).

Later that night, Sheriff Evans terminated plaintiff from his position with the Rice County Sheriff's Office. *Id.* (Am. Compl. ¶ 35). The following day, Sheriff Evans filed a report with the Kansas Commission on Peace Officers' Standards and Training ("KS-CPOST"). *Id.* (Am.

Compl. ¶ 36).  In his report, "Sheriff Evans wrote, falsely, that Tanksley had been insubordinate, had failed to adhere to Policies and Procedures, was very defiant and argumentative when directed to make corrections to his reports, caused turmoil with the office, and had failed to listen to directions from supervisors." *Id.* (Am. Compl. ¶ 36) (internal quotation marks omitted).  Also, Sheriff Evans's report to KS-CPOST "alleged that Tanksley failed to enter a Missing Persons Report." *Id.* (Am. Compl. ¶ 37).  All of the allegations in Sheriff Evans's report to KS-CPOST were "known to be false by Evans when he submitted the description." *Id.* (Am. Compl. ¶ 38).

### B.  Procedural Background

Plaintiff filed his original Complaint in December 2019 (Doc. 1).  Then, in early March 2020, plaintiff filed his Amended Complaint (Doc. 5).  About one month later, defendants filed a Motion to Dismiss and Memorandum in Support (Docs. 11, 12).  And so began a waiting game of sorts.

In total, plaintiff secured five separate extensions of time to respond to defendants' Motion to Dismiss.  *See* Docs. 13, 16, 19, 21, 23.  Each time, the court obliged plaintiff's request.  *See* Docs. 15, 18, 20, 22, 24.  Twice, the court reminded plaintiff it didn't plan to grant any further extensions.  *See* Docs. 22, 24.  The reason was plaintiff's extensions totaled almost two months' time.  *See* D. Kan. Rule 6.1(d)(2) ("Responses to motions to dismiss . . . must be filed and served within 21 days.").  Finally, on June 26, 2020, plaintiff filed his Response (Doc. 26).

The very next day, plaintiff filed his Motion for Leave to File Second Amended Complaint and to Substitute Party (Doc. 27).  After securing one extension of their own, defendants—on July 24, 2020—filed a Response in opposition (Doc. 32).  Plaintiff didn't reply.

*See* D. Kan. Rule 7.1(c) ("Within the time provided in D. Kan. Rule 6.1(d) . . . . [t]he moving party may file and serve a written reply brief or memorandum.").

Plaintiff's Motion to Amend rests on two premises.  *First*, plaintiff wishes to "substitute the Board of County Commissioners of Rice County for the Sheriff's Office as a party Defendant." Doc. 27 at 1 (citation omitted).  It seems plaintiff realized—presumably after reading defendants' Motion to Dismiss—that he can't actually sue the Rice County Sheriff's Office.  *Id.  Second*, plaintiff wishes to supply additional "substantive fact and law allegations." *Id.* at 1–2.

But, that's not all.  On the first of September 2020, plaintiff filed a Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 34).  Defendants filed a Response in opposition (Doc. 36).  This time, plaintiff came back with a Reply (Doc. 37).  In these papers, plaintiff asks the court to certify a few questions to the Kansas Supreme Court about the substance of several state laws because, he argues, those details are unclear at present.  *See* Doc. 34.  He says the issues may prove pivotal in this case.  *Id.*

## II.  Legal Standards

### A.  Plaintiff's Motion to File Second Amended Complaint and Substitute Party

A court "should freely give" leave to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Supreme Court views this passage from Rule 15 as a "mandate . . . to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  If "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*  And, "the Federal Rules of Civil Procedure are designed to facilitate decisions on the merits rather than on pleading technicalities." *Bank*

*Midwest, N.A. v. Millard*, No. 10-2387-JAR-DJW, 2012 WL 4006423, at *1 (D. Kan. Sept. 12, 2012) (citing *Koch v. Koch Indus.*, 127 F.R.D. 206, 209 (D. Kan. 1989)).

Granting "leave to amend is a matter committed to the court's sound discretion." *Collins v. Wal-Mart, Inc.*, 245 F.R.D. 503, 507 (D. Kan. 2007). Still, leave to amend "should be denied only when the court finds 'undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" *Id.* (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)).

Defendants argue the court should deny plaintiff's request because it's futile. Doc. 32 at 1. In this setting, futility carries a technical meaning. That is, a "court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss or if it fails to state a claim upon which relief may be granted." *Collins*, 245 F.R.D. at 507 (first citing *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992); then citing *Stewart v. Bd. of Comm'rs for Shawnee Cnty.*, 216 F.R.D. 662, 664 (D. Kan. 2003); then citing *Lyle v. Commodity Credit Corp.*, 898 F. Supp. 808, 810 (D. Kan. 1995)). "In determining whether a proposed amendment should be denied as futile, the court must analyze a proposed amendment as if it were before the court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Price v. City of Wichita*, No. 12-1432-CM-DJW, 2014 WL 289453, at *4 (D. Kan. Jan. 27, 2014) (citing *Collins*, 245 F.R.D. at 507). Last, and as defendants acknowledge, they bear the burden to establish futility. Doc. 32 at 1 (citing *Price*, 2014 WL 289453, at *3).

### B. Plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court

As explained in an earlier opinion:

Kan. Stat. Ann. § 60-3201, authorizes our court to certify questions to the Kansas Supreme Court if "questions of law of [the state of Kansas]" arise in the case before it "which may be determinative . . . and [about] which it appears . . . there is no

controlling precedent in the decisions" of the Kansas Supreme Court or Kansas
Court of Appeals.

*Bedivere Ins. Co. v. Blue Cross and Blue Shield of Kan., Inc.*, __ F. Supp.3d __, No. 18-2371-
DDC-JPO, 2020 WL 5819612, at *37 (D. Kan. Sept. 30, 2020) (quoting Kan. Stat. Ann. § 60-
3201).  When "the law is unsettled and dispositive, the court may ask the Kansas Supreme Court
to answer those questions of law to aid the court."  *Id.* (citations omitted).

Defendants note, "[i]n this circuit, a novel question of law governed by unsettled state
law makes certification appropriate."  *Goolsby v. Mgmt. & Training Corp.*, No. 14-4019-SAC,
2014 WL 2988748, at *1 (D. Kan. July 2, 2014) (citing *Pehle v. Farm Bureau Life Ins. Co.*, 397
F.3d 897, 900 n.1 (10th Cir. 2005)); *see also* Doc. 36 at 1.  But, even when appropriate under this
framing, certification "is never compelled."  *Pehle*, 397 F.3d at 900 n.1 (citing *Lehman Brothers
v. Schein*, 416 U.S. 386, 390–91 (1974)).  Indeed, the Tenth Circuit has held that "[w]hether to
certify a question of state law to the state supreme court is within the discretion of the federal
court."  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) (citations omitted).
"Certification is not to be routinely invoked whenever a federal court is presented with an
unsettled question of state law."  *Id.* (citations omitted).

### C.  Defendants' Motion to Dismiss

Defendants "move the [c]ourt for an order dismissing Plaintiff's claims against them"
under Federal Rule of Civil Procedure 12(b)(6).  Doc. 11 at 1.  To consider their request, the
court also turns to Fed. R. Civ. P. 8(a)(2).  That Rule requires that a complaint contain "a short
and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.
8(a)(2).  Although this Rule "does not require 'detailed factual allegations,'" it demands more
than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of

the cause of action'" which, as the Supreme Court explained, "'will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume the factual allegations in the complaint are true.  *Id.* (citing *Twombly*, 550 U.S. at 555). But, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Twombly*, 550 U.S. at 555 (citations omitted).

For a complaint to survive a motion to dismiss under Rule 12(b)(6), the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

## III.    Analysis

### A.  Plaintiff's Motion to Amend Complaint and Substitute Party

Plaintiff seeks leave of court to amend his complaint for a second time.  *See* Doc. 27. And, he cites two different reasons why.  *First*, he wants to swap out a party defendant.  *Id.* at 1. That is, plaintiff's Amended Complaint lists the Rice County Sheriff's Office as one of two named defendants.  Doc. 5 at 1.  But, defendants "identified authority to the effect that the Rice County Sheriff's Office does not have the capacity to be sued."  Doc. 27 at 1.  So, plaintiff "is proposing to substitute the Board of County Commissioners of Rice County for the Sheriff's Office as a party Defendant."  *Id.* (citation omitted).  *Second*, plaintiff wants to amend his complaint for a second time to shore up his legal and factual allegations.  *Id.* at 1–2.  That is, his "proposed Second Amended Complaint addresses both the party capacity issue and the [defendants'] arguments about the plausibility of the Amended Complaint."  *Id.* at 2 (citation omitted).

As the court already noted, defendants oppose plaintiff's request.  *See* Doc. 32.  They say it's futile because, even with the proposed amendments, plaintiff still fails to state plausible claims for relief.  *Id.* at 1–2.  Therefore, they argue, it's pointless to permit plaintiff to file a Second Amended Complaint.  *Id.*  And, they recognize their burden to prove futility, but claim their papers shoulder the burden.  *Id.* at 1 (citation omitted).  "In support of their position," defendants direct the court to "their arguments and authorities . . . provided to the [c]ourt in their Memorandum in Support of Motion to Dismiss and their Reply to Plaintiff's Memorandum in Opposition to Motion to Dismiss."  *Id.* at 2 (citing Docs. 12, 31).

Because the court concludes plaintiff hasn't alleged plausible claims under federal and state statutes or the United States Constitution even with the putative amendments in his proposed Second Amended Complaint, it also must conclude that defendants are right about futility.  No number of amendments can cure these fundamental defects.  Even if the court

11

permitted plaintiff to file an amended complaint substituting the Board of County

Commissioners of Rice County as a party defendant and including his other factual assertions to

support his federal and state law claims, they still fail to state plausible claims for relief for all

the reasons discussed below.  *See infra* Part III. C–D.  The court thus denies plaintiff's Motion

for Leave to File Second Amended Complaint (Doc. 27).  *See Collins*, 245 F.R.D. at 507

(explaining that courts "may deny a motion to amend as futile if the proposed amendment would

not withstand a motion to dismiss or if it fails to state a claim upon which relief may be granted"

(first citing *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992); then citing *Stewart v. Bd. of

Comm'rs for Shawnee Cnty.*, 216 F.R.D. 662, 664 (D. Kan. 2003); then citing *Lyle*, 898 F. Supp.

at 810)).

### B.  Plaintiff's Motion to Certify Questions to Kansas Supreme Court

Next, plaintiff asks the court to certify several questions about state law to the Kansas

Supreme Court.  *See* Doc. 34.  The first two questions arrived in plaintiff's Motion to Certify

Questions to Kansas Supreme Court.  *Id.*  Then, in his Reply responding to defendants'

opposition to this matter, plaintiff proposed a third question for certification.  Doc. 37 at 1–2.

Plaintiff's proposed questions are:  (1) "[w]hether [Kan. Stat. Ann. §] 74-5611a(e) provides

absolute immunity to law enforcement officers and law enforcement agencies to a claim of

Blacklisting under [Kan. Stat. Ann. §] 44-117, et seq."; (2) "[w]hether Blacklisting is subject to a

one-year statute of limitations or a three-year statute of limitations"; and (3) "[w]hether a civil

claim of Blacklisting under [Kan. Stat. Ann. §] 44-117, et seq[.] must have as an element of the

claim a criminal conviction of the plaintiff's employer."  *See* Docs. 34 at 2, 37 at 1–2.

The questions need certifying, plaintiff asserts, because the substance of these laws is in

doubt.  Doc. 34 at 1 (arguing that plaintiff's blacklisting claims, under Kansas law, turn on

12

questions for which "there is no controlling precedent in the decisions of the Kansas Supreme Court or the Kansas Court of Appeals"). Plaintiff contends this substance matters a great deal to the outcome of his case. *Id.* (asserting these state law issues may prove determinative of plaintiff's blacklisting claims).

Again, defendants disagree. *See* Doc. 36. Their arguments aren't far from the ones they've presented to oppose plaintiff's motion to amend his complaint. *See id.*; *see also* Doc. 32. There, defendants call plaintiff's efforts futile. *See* Doc. 32. Here, they call them "irrelevant." Doc. 36 at 2. Regardless, they argue his request "does not serve the best interests" of this litigation—particularly at this juncture—because the court ought to deem the request moot. *Id.* In other words, because defendants want the court to dismiss plaintiff's federal claims and decline to exercise supplemental jurisdiction over his arguments arising under state law, they say there's no need even to borrow the trouble plaintiff envisions. *Id.* ("If plaintiff's federal claims are dismissed and the [c]ourt declines to exercise supplemental jurisdiction, Plaintiff's Motion will be moot.").

The court needn't dissect the parties' legal arguments at this point because, later, this order explains why plaintiff's questions address issues that either are irrelevant to the outcome or involve questions that Kansas courts already have decided. The court denies plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 34).

With that, the court now turns to the main event.

### C.  Defendants' Motion to Dismiss on Federal Grounds

Of plaintiff's five total claims against defendants, only two touch the United States Constitution or federal law. And, those two claims are asserted against Sheriff Evans,

exclusively. *See* Doc. 5 at 8–11 (Am. Comp. ¶¶ 61–81). The court starts with these two claims, both arising under a federal question.

### 1. Plaintiff's Claim Against Sheriff Evans Under 42 U.S.C. § 1983 For "Fourteenth Amendment Liberty Interest—Stigma Plus"

According to plaintiff, the report that Sheriff Evans filed with KS-CPOST violated plaintiff's constitutional rights. Doc. 5 at 8–9 (Am. Compl. ¶¶ 61–68). Specifically, plaintiff asserts that Sheriff Evans's report breached his Fourteenth Amendment rights because the "inaccurate and false report . . . created a stigma upon the reputation of the Plaintiff." *Id.* at 8 (Am. Compl. ¶ 63). That effect, he says, is in tension with 42 U.S.C. § 1983 and the "Fourteenth Amendment to the U.S. Constitution," which "forbids governmental actors from creating a stigma against individuals that deprives the individual of tangible interests." *Id* (Am. Compl. ¶ 62). It "also deprived the Plaintiff of tangible interests, including his future employment prospects in the field of law enforcement." *Id.* (Am. Compl. ¶ 64). All of this, plaintiff asserts, should entitle him to a long list of relief, ranging from back pay to punitive damages. *Id.* at 9 (Am. Compl. ¶ 68).

Defendants don't think plaintiff has stated a claim upon which the court can grant relief. *See* Doc. 12 at 11–15. In their view, Sheriff Evans followed the law when he prepared that KS-CPOST report. *Id.* at 12 ("This mandatory report, which Sheriff Evans filed shortly after Plaintiff's termination, as required, is the sole basis for Plaintiff's Fourteenth Amendment liberty interest claim."). They're right. Below, the court explains why.

A recent Tenth Circuit holding is dispositive of this issue. *See Ellison v. Roosevelt Cnty. Bd. of Cnty. Comm'rs*, 700 F. App'x 823 (10th Cir. 2017). In *Ellison*, the Tenth Circuit confronted similar allegations from a law enforcement officer who had lost his job. *See id.* at 825 ("According to the first amended complaint, Mr. Ellison was fired for arresting his

supervisor's acquaintance, reporting another officer's misconduct, and generally refusing to cover up wrongdoing at the . . . Sheriff's Office.").  There, as here, plaintiff "contends his job performance report and [defendant officer's] written statement infringed his liberty interests[.]" *Id.* at 830.  And so, there, as here, the terminated officer raised claims against a sheriff's department under the Fourteenth Amendment.  *Id.* at 830.

What counts as a protected liberty interest under the Fourteenth Amendment?  In *Ellison*, the Tenth Circuit described the framework for courts considering claims like the present one:

> "The government infringes upon [plaintiff's Fourteenth Amendment liberty interest] when:  (1) it makes a statement that impugns the good name, reputation, honor, or integrity of the employee;  (2) the statement is false;  (3) the statement is made during the course of termination *and* forecloses other employment opportunities;   and  (4) the statement is published, in other words disclosed public[ly]."

*Id.* (quoting *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014)).  This guiding framework serves to protect government employees in qualifying scenarios because "'a public employee has a liberty interest in his good name and reputation . . .  to his continued employment.'"  *Id.* (quoting *McDonald*, 769 F.3d at 1212 (brackets omitted)).  To prevail on a Fourteenth Amendment liberty interest claim—the claim asserted here—plaintiff must demonstrate that *each* of these four criteria is satisfied.  *Id.* ("'These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.'" (quoting *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994))).

In this case, the court need not look beyond the first element:  whether the alleged statement "impugns the good name, reputation, honor, or integrity of the employee."  *Id.* at 830 (internal quotation marks and citation omitted).  This factor considers whether the action at issue involved "sufficiently stigmatizing information implicating [plaintiff's] liberty interests."  *Id.* at

831.  In *Ellison*, the court established logical boundaries for this test.  That is, the court defined the parameters of what falls within or outside the bounds of a so-called stigmatizing statement.

Accusing a police officer "of filing a false police report *is* sufficiently stigmatizing to impugn his or her good name, reputation, honor, or integrity."  *Id.* at 831 (citing *Palmer v. City of Monticello*, 31 F.3d 1499, 1503 (10th Cir. 1994) ("We are satisfied that an accusation that a police officer falsified a speeding ticket qualifies as a stigmatizing charge which amply supports that element of a liberty interest.")) (emphasis added).  In contrast, "'charges involving negligence and neglect of duties . . . are *insufficient* to establish a liberty interest deprivation.'"  *Id.* at 831 (quoting *Se. Kan. Cmty. Action Program Inc. v. Sec'y of Agric.*, 967 F.2d 1452, 1458 (10th Cir. 1992)) (emphasis added).  "Likewise, a claim that an officer failed to conduct an investigation to the satisfaction of his supervisor is *not* sufficiently stigmatizing."  *Id.* (citing *Bailey v. Kirk*, 777 F.2d 567, 572–73 (10th Cir. 1985)) (emphasis added).

Even construing every factual allegation in plaintiff's favor—as the court must at this stage of the litigation—his Fourteenth Amendment claim can't survive this standard.  According to plaintiff, Sheriff Evans's report claimed falsely that he was "insubordinate," failed to follow the department's "Policies and Procedures," took a "defiant and argumentative" approach to his work—particularly "when directed to make corrections," didn't listen to his supervisors, and "failed to enter a Missing Persons Report."  Doc. 5 at 5 (Am. Compl. ¶ 36–37).

Plaintiff's "situation is analogous to those cases involving negligence and poor job performance."  *Ellison*, 700 F. App'x at 831.  And, "charges involving negligence and neglect of duties" aren't enough to establish a Fourteenth Amendment liberty interest.  *Id.* (citation and internal quotation marks omitted); *see also id.* ("Nor are derogatory statements that a public employee was 'a slow worker with poor work habits and low productivity' sufficient to implicate

his or her liberty interests." (quoting *Stritzl v. U.S. Postal Serv.*, 602 F.2d 249, 252 (10th Cir. 1979) (alterations in original))).

In other words, even if Sheriff Evans's report was entirely false—as plaintiff alleges in his Amended Complaint and the court thus assumes at this stage of the action—those statements in his report addressed "charges involving negligence and neglect of duties" as well as "a claim that an officer failed to conduct an investigation to the satisfaction of his supervisor[.]"  *Id.* These charges, the Tenth Circuit holds, do not rise to a level of legal sufficiency under the Fourteenth Amendment.  *Id.* at 832 ("These charges fault [plaintiff] for poor performance and failing to execute his professional responsibilities to the satisfaction of his supervisor, which under these circumstances, are not sufficiently stigmatizing to raise Fourteenth Amendment concerns.").[3]

For these reasons, the court dismisses plaintiff's claim under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

### 2.   Plaintiff's Claim Against Sheriff Evans Under 42 U.S.C. § 1983 For "First Amendment Speech Rights"

Plaintiff asserts one other federal claim.  As before, he asserts this claim solely against Sheriff Evans.

---

[3]     As one reason justifying leave to file a second amended complaint, plaintiff argues that Sheriff Evans also stated plaintiff could be subject to misdemeanor prosecution or civil liability for failing to enter a missing persons report.  *See* Docs. 27-1 at 6 (Proposed Second Am. Compl. ¶ 37), Doc. 26 at 12. This detail doesn't affect the outcome.  Even if Sheriff Evans's statement was false and plaintiff might have been prosecuted or sued for failing to file a missing persons report, plaintiff doesn't allege that Sheriff Evans lied about his job performance in a way that implicates falsifying reports, general dishonesty, or allegations "impugn[ing] the good name, reputation, honor, or integrity of the employee." *Ellison*, 700 F. App'x at 830 (citation omitted).  Instead, these details describe "charges involving negligence and neglect of duties" and "a claim that an officer failed to conduct an investigation to the satisfaction of his supervisor."  *Id.* at 831.  *Ellison* holds these statements don't suffice.  *Id.*

This claim alleges that "Defendant Evans, who was involved with the retaliation and termination, caused the Plaintiff to be deprived of his First and Fourteenth Amendment rights."[4] Doc. 5 at 9 (Am. Compl. ¶ 73).  Sheriff Evans did so "under color of state law" and in relation to "speech uttered by the Plaintiff . . . not ordinarily within his official duties."  *Id.* at 10 (Am. Compl. ¶¶ 74, 76).  On top of that, plaintiff argues, his speech touched matters of public concern. *Id.* (Am. Compl. ¶ 77).  And, plaintiff alleges, the "interests of the governmental employer do not outweigh the interests of the Plaintiff."  *Id.* (Am. Compl. ¶ 78).  Last, plaintiff asserts his protected speech was the but-for cause of his termination.  *Id.* (Am. Comp. ¶ 80) (alleging that Sheriff Evans "would not have retaliated and terminated the Plaintiff in the absence of the protected speech of the Plaintiff").

Our Circuit recognizes that "'[p]ublic employees do not surrender their First Amendment rights by virtue of their employment with the government.'"  *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1180 (10th Cir. 2018) (quoting *Martin v. City of Del City*, 179 F.3d 882, 886 (10th Cir. 1999)).  "A 'government employer cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"  *Id.* (quoting *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1285 (10th Cir. 2003)).  But, our Circuit also recognizes that "'the government has important interests in maintaining an efficient workplace and promoting the services that it renders,'" and so, "'the government has an increased degree of discretion in regulating a public employee's speech.'"  *Id.* at 1180–81 (quoting *Martin*, 179 F.3d at 886).

---

[4]     Plaintiff doesn't explain his reference here to the Fourteenth Amendment.  But, the court assumes his point is one that's familiar:  the "First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976) (first citing *Bigelow v. Va.*, 421 U.S. 809, 811 (1975); then citing *Schneider v. New Jersey*, 308 U.S. 147 (1939)).

The Tenth Circuit thus has directed district courts to balance "the interests of public employees in commenting on matters of public concern and the interests of government employers in performing services efficiently" by using the "five-part *Garcetti/Pickering* test." *Id.* at 1181; *see also Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301–02 (10th Cir. 2009) (first citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006); then citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The *Garcetti/Pickering* test consists of five prongs: "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Dixon*, 553 F.3d at 1302. The Tenth Circuit has instructed that the first three elements present "issues of law to be decided by the court[.]" *Id.* The "last two are factual issues to be decided by the factfinder." *Id.*

In keeping with the Circuit's instruction, the court focuses its analysis here on the first three prongs because they "are said to be issues of law to be decided by the court[.]" *Id.* Defendants focus their arguments on these three issues as well, at least for the most part. In their view, plaintiff's comments were spoken pursuant to his official duties, didn't touch matters of public concern, and weren't a motivating factor in his firing. *See* Doc. 12 at 6–11. Here again, the court agrees with defendants.[5]

---

[5]     Because the court concludes that plaintiff's Amended Complaint fails to allege a constitutional violation based on First Amendment retaliation, the court needn't reach defendants' third argument—*i.e.*, that plaintiff's termination wasn't causally connected to his statements.

The Amended Complaint, viewed in plaintiff's favor, fails to allege facts capable of supporting a finding or inference that plaintiff engaged in First Amendment protected speech under the first three elements of the *Garcetti/Pickering* analysis.  The Amended Complaint thus fails to state a plausible First Amendment retaliation claim under § 1983 for three independent reasons.  Below, the court addresses all three of them.

### a.  Plaintiff's speech was made as part of his official duties.

The first inquiry under the *Garcetti/Pickering* analysis "is whether the employee spoke 'pursuant to [his] official duties.'"  *Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421) (other citation omitted).  "While 'employees retain the prospect of constitutional protection for their contributions to civic discourse,' they do not have First Amendment protection for statements made 'pursuant to employment responsibilities.'"  *Id.* (first quoting *Garcetti*, 547 U.S. at 422; then quoting *id.* at 423–24).  "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'"  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422).  "Thus, 'speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation.'"  *Hesse*, 541 F.3d at 1249 (quoting *Brammer-Hoelter*, 492 F.3d at 1203).  "The determination of whether a public employee speaks pursuant to official duties is a matter of law." *Id.* (citing *Brammer-Hoelter*, 492 F.3d at 1203).

The Tenth Circuit takes a "broad" view of the definition of speech that is made "pursuant to" an employee's "official duties."  *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008).  "[S]peech may be made pursuant to an employee's official duties even if it deals

with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203. So long as the employee's speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.* "The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" *Id.* (quoting *Garcetti*, 547 U.S. at 422).

To decide this question, the Tenth Circuit takes "a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Id.* at 1204 (quoting *Garcetti*, 547 U.S. at 422 ("'The proper inquiry is a practical one.'")). The Tenth Circuit applies a "case-by-case approach, looking to both the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010).

Plaintiff's Amended Complaint alleges that Sheriff Evans violated his First Amendment rights when plaintiff spoke directly to his supervisors about concerns surrounding other employees' conduct and general workplace functioning. *See, e.g.*, Doc. 5 at 2–5 (Am. Compl. ¶¶ 11, 13, 21, 31, 33–34). As our Circuit has explained, "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*." *Rohrbough*, 596 F.3d at 747 (citations omitted). "But an employee's decision to go outside of [his] ordinary chain of command does not necessarily insulate [his] speech." *Id.* Instead, "the proper focus is ultimately still whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007)).

Plaintiff's allegations in the current case don't test the limits of this framework.  His Amended Complaint effectively concedes that both of the individuals he made these reports to—Sheriff Evans and Undersheriff Murphy—were within his chain of command.  Doc. 5 at 2 (Am. Comp. ¶¶ 8–9) (explaining that Sheriff Evans both commissioned and terminated his employment and that "[o]thers in Deputy Tanksley's chain of command included the Undersheriff, Chad Murphy").  So, his Amended Complaint alleges that plaintiff directed his speech to his supervisors—but no one outside that chain of command.  And, all of plaintiff's reports addressed issues that are comparable to prior cases, where the Tenth Circuit upheld a district court's conclusion that the First Amendment wasn't offended.  *See Rohrbough*, 596 F.3d at 750–51 (holding that plaintiff's communications with other hospital employees about an alleged staffing crisis, alleged incidents of sub-standard care, and a heart misallocation "were all within the scope of [plaintiff's] official duties under the first prong of the *Garcetti/Pickering* analysis"); *see also Ellison*, 700 F. App'x at 829–30 (affirming district court's Fed. R. Civ. P. 12(b)(6) dismissal of a deputy sheriff's First Amendment retaliation claim because his alleged speech—which included a disagreement with a lieutenant about the legality of a traffic stop and his reports about another officer's misconduct—were within the scope of his official duties).

Plaintiff argues his speech wasn't made pursuant to his official duties because it involved misconduct, and he "did not work in internal affairs or work as a Deputy assigned to investigate and report misfeasance, malfeasance, corruption or systemic abuse."  Doc. 26 at 5.  "This fact alone," he says, "takes the . . . speech at issue outside of his ordinary duties."  *Id.*  In reaching this conclusion, plaintiff emphasizes *Lane v. Franks*, 573 U.S. 228 (2014).  He doesn't think our Circuit has applied "important guidance from *Lane*"—language which, he argues, functions to limit *Garcetti*'s holding.  Doc. 26 at 4 (citation omitted).  In *Lane*, the Court held the "critical

question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. But, the Circuit *has* considered this detail.

In *Holub*, the Tenth Circuit addressed exactly the subject that plaintiff claims it never has discussed. *Holub v. Gdowski*, 802 F.3d 1149, 1155–56 (10th Cir. 2015). Applying the Supreme Court's ruling in *Lane*, the Tenth Circuit likewise discussed a plaintiff's arguments that mirror the ones plaintiff asserts in this matter. *Id.* at 1155. For instance, the *Holub* plaintiff argued the "district court failed to correctly apply the Supreme Court's recent decision in *Lane v. Franks*." *Id.* In the current matter, plaintiff argues "that important guidance from *Lane* has not been applied by the Circuit[.]" Doc. 26 at 4. In *Holub*, plaintiff contended "*Lane* effectively narrowed the meaning of 'official duties' and thus broadened the First Amendment's protection of public employees' speech." *Holub*, 802 F.3d at 1155. That is, plaintiff contends, "Holub zeroe[d] in on *Lane*'s use of the term 'ordinary'—a term *Garcetti* didn't use." *Id.* Here, plaintiff zeroes in on the "use of the word 'ordinary' by the court in *Lane*." Doc. 26 at 4 (citing *Mpoy v. Rhee*, 758 F.3d 285, 294–95 (D.C. Cir. 2014)).

The parties have read the Tenth Circuit's opinion in *Holub*, so the court forgoes a comprehensive case summary. For present purposes, what matters most about *Holub* is this: (1) the Tenth Circuit has addressed the argument that plaintiff makes here, and (2) the Tenth Circuit rejected it. *Holub*, 802 F.3d at 1156–57 ("Our own decisions interpreting *Garcetti*'s first step are consistent with this focus." (first citing *Brammer-Hoelter*, 492 F.3d at 1203; then citing *Green*, 472 F.3d at 801)).

Construing plaintiff's allegations in his favor, he wore his uniform—either literally or figuratively—when he made these reports. He alleges he raised these reports directly up the

chain of command at the Sheriff's Office.  So, his reports bear a strong resemblance to speech that one would make within the course of employment.  In other words, the facts alleged establish that plaintiff was speaking as an employee, not a private citizen.  Accordingly, his alleged speech didn't come equipped with the First Amendment protections that attach to private citizens' speech.  Defendants are right.  Plaintiff fails to plead a plausible § 1983 claim because he alleges that he engaged in speech that was made as part of his official duties.

### b.  Plaintiff's speech was not a matter of public concern.

In addition, the speech described in the Amended Complaint doesn't satisfy the second prong of the *Garcetti/Pickering* test—*i.e.*, plaintiff's speech didn't address a matter of public concern.  Speech reaches matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"  *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (other internal quotations omitted).  "The inquiry turns on the 'content, form, and context' of the speech."  *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

To satisfy this requirement, plaintiff must allege facts capable of supporting a reasonable finding or inference that his speech "involve[d] a matter of public concern and not merely a personal issue internal to the workplace."  *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995) (citing *Connick*, 461 U.S. at 146–47); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." (citation and internal quotation marks omitted)).  When deciding this issue, the court may consider "'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely

deals with personal disputes and grievances unrelated to the public's interest.'" *Brammer-Hoelter*, 492 F.3d at 1205 (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1214 (10th Cir. 2000)).

"Statements revealing official impropriety usually involve matters of public concern." *Id.* (citing *Lighton*, 209 F.3d at 1224). "Conversely, speech that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern." *Id.* (quoting *Lighton*, 209 F.3d at 1225). In short, a public employee's First Amendment right to free speech "'is not a right to transform everyday employment disputes into matters for constitutional litigation.'" *Morris*, 666 F.3d at 663 (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011)).

As plaintiff sees things, each of his three reports to supervisors about alleged misconduct inherently touched public concerns because those reports involved "activities that were either criminal statutory violations or violations of the U.S. Constitution." *Id.* at 9. Here, the court needn't parse the substance of Kansas state law to agree with plaintiff about one detail. But even on this point, the court's agreement is limited. Specifically, plaintiff reported to Sheriff Evans "that other deputies were using their county patrol vehicles to work for a private security company owned by Undersheriff Murphy . . . . [and] were, at times, on duty and in uniform" while doing so. Doc. 5 at 2 (Am. Compl. ¶¶ 11–12).

This report alleged misconduct by other officers at the Rice County Sheriff's Office. "Statements revealing official impropriety *usually* involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205 (citation omitted and emphasis added). Viewed in isolation, the substance of this statement could generate at least a possibility that it addressed a matter of public concern. *See id.* But, the court can't view the statement in isolation. "Whether an

employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

Here, however, the court can't conclude that plaintiff's Amended Complaint could support a reasonable finding or inference that the form and context of his statements implicate matters of public concern. The Supreme Court's holding in *Garcetti* makes clear that a plaintiff's speech deserves First Amendment protection only when "the employee spoke *as a citizen* on a matter of public concern." *Garcetti*, 547 U.S. at 418 (emphasis added). In this case, the form and context of plaintiff's speech signal that he spoke as a government employee. For instance, he reported his concerns to supervisors within the workplace, and only to supervisors within the workplace. In other words, he didn't speak publicly about alleged public concerns. *Connick* instructs this court to consider the content, form, and context of a public employee's speech. *Connick*, 461 U.S. at 147–48. At best, one bit of the information that plaintiff reported to supervisors—*i.e.*, "that other deputies were using their county patrol vehicles to work for a private security company owned by Undersheriff Murphy . . . . [and] were, at times, on duty and in uniform"—hits one out of those three criteria. Doc. 5 at 2 (Am. Compl. ¶¶ 11–12). The content of that complaint may have amounted to statements involving matters of public concern. But the form and context of all three of plaintiff's conversations with supervisors heavily favors a finding that he spoke as a public employee, not a private citizen.

Aside from this point, another of plaintiff's reports didn't necessarily implicate a public concern at all. Plaintiff alleges that he "arrested or detained an individual for an outstanding warrant after the same individual had been arrested the previous night on the same warrant." Doc. 5 at 4 (Am. Compl. ¶ 27). This, he alleges, "potentially violated the Fourth Amendment."

*Id.* (Am. Compl. ¶ 30). And, he alleges, he told Undersheriff Murphy that specific employees at the Sheriff's Office needed training on this topic and likewise "needed to follow this procedure." *Id.* at 4–5 (Am. Compl. ¶¶ 31–34). These details supply an important reason to view his comments as ones that didn't address a matter of public concern.

The substance and context of plaintiff's fourth (and final) conversation with a supervisor about alleged workplace misconduct resemble internal grievances, not public concerns. Plaintiff alleges that he told his supervisor that other officers, including Sheriff Evans, needed better training about how to file arrest reports. *Id.* at 4–5 (Am. Compl. ¶¶ 33–34). To be blunt, it's difficult to imagine a scenario more quintessentially tied to internal employment disputes. By reporting to one supervisor that another supervisor and other officers weren't doing their jobs— as plaintiff saw fit—plaintiff called into question the hierarchy regulating workflow within the Rice County Sheriff's Office. In other words, the fact that plaintiff complained to his supervisors about how others in the office—including his boss—performed their job duties shows that he was speaking about problems internal to his workplace, and not about matters of public concern.

All of plaintiff's allegations involve context that clues the court toward finding that his comments were made in private, not public. Plaintiff identifies "at least one media outlet, *The Hutchinson News*, which published a story about the filing [of his lawsuit] under the headline, 'Former Rice County deputy: Reporting wrongs led to firing.'" Doc. 26 at 9 (citation omitted). He argues this story provides "evidence that the matters raised in the lawsuit were matters of public concern." *Id.*

The court disagrees. Plaintiff raised his concerns internally—that's it. *See generally* Doc. 5; *see also* Doc. 31 at 6 ("None of the complaints were made to anyone outside of the

Sheriff's Department.").  While his *lawsuit* generated at least one example of local media coverage, his comments generated no media attention.  Plaintiff's logic places the cart before the horse.  To hold otherwise would mean that government employees could secure First Amendment protections by filing a lawsuit, if the lawsuit later garners media attention.  Plaintiff's argument reveals the distinction between a matter of public concern because of its substance and context and one made publicly *known* by virtue of its existence.

Regardless, a "public employee's speech does not attain the status of public concern simply 'because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest.'"  *Salehpoor v. Shahinpoor*, 358 F.3d 782, 788 (10th Cir. 2004) (quoting *Connick*, 461 U.S. at 148 n.8).  Plaintiff fails to state a plausible § 1983 claim for this second and independent reason.  His Complaint fails to allege facts capable of supporting a reasonable finding or inference that he was speaking on a matter of public concern.

### c.  As his employer, the government's interests in providing an efficient public service outweighed plaintiff's interests in his speech.

The third prong of the Circuit's standard requires the court to ask "whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests."  *Dixon*, 553 F.3d at 1302.  Here, the court answers this question in the affirmative.  In other words, and particularly with respect to plaintiff's alleged remarks that Sheriff Evans and other officers needed better training about how to file arrest reports, plaintiff's alleged comments functioned to subvert the order of authority in his office.  That is, plaintiff reported to one supervisor that another supervisor (and additional officers) weren't doing their jobs according to *plaintiff's* preferences.  In so doing, his statements

risked clogging the gears of "the efficiency of the public service" offered by the Sheriff's Office. *Id.* Accordingly, this court finds as a matter of law that plaintiff's alleged statements weren't so valuable that they superseded the broader value to his community of an efficient sheriff's department.

To review these findings, *first*, plaintiff's allegations—construed in his favor—reveal that he didn't speak as a private citizen when he reported his concerns to his supervisors (and only to his supervisors). *See Brammer-Hoelter*, 492 F.3d at 1203 ("The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" (quoting *Garcetti*, 547 U.S. at 422)). *Second*, he doesn't allege any facts capable of supporting a finding or reasonable inference that he was speaking on matters of public concern. *Lane*, 573 U.S. at 241 ("The inquiry turns on the 'content, form, and context' of the speech." (quoting *Connick*, 461 U.S. at 147–48)). And *third*, the facts alleged, even when viewed in plaintiff's favor, provide no basis for a plausible finding or inference that plaintiff's free speech interests outweighed his government employer's interest in workplace efficiency. *Dixon*, 553 F.3d at 1302. These shortcomings negate the third prong of the *Garcetti/Pickering* test and thus provide a third independent reason to dismiss his claim based on free speech rights.

### 3. Qualified Immunity

Qualified immunity provides yet another independent reason to dismiss plaintiff's § 1983 claims. He asserts his federal claims against Sheriff Evans only. *See* Doc. 5 at 8–10 (Am. Compl. ¶¶ 61–81). In their Motion to Dismiss, defendants argue plaintiff must lose on his arguments—as a matter of law—because Sheriff Evans is entitled to qualified immunity. *See* Doc. 12 at 15–19. Plaintiff disagrees. Doc. 26 at 14–15.

A state official sued in his individual capacity for money damages is entitled to qualified immunity unless plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A court should endeavor to resolve an assertion of qualified immunity "'at the earliest possible stage in litigation.'"  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curium)).  That's because "qualified immunity is 'an immunity from suit rather than a mere defense to liability[.]'"  *Id.* at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  It "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery[.]'"  *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (quoting *Mitchell*, 472 U.S. at 526).  Up against a § 1983 claim, the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818).

The above analysis explains why plaintiff doesn't have a constitutional claim under either the First or Fourteenth Amendments to the United States Constitution.  This analysis concludes plaintiff didn't have a "clearly established" right, *see Harlow*, 457 U.S. at 818, "at the time of the challenged conduct[,]" *see Ashcroft*, 563 U.S. at 735.

Plaintiff references *Casey v. West Las Vegas Independent School District*, 473 F.3d 1323 (10th Cir. 2007).  Doc. 26 at 15.  He thinks it supports his argument that Sheriff Evans doesn't deserve qualified immunity.  *Id.*  That isn't the case.  In *Casey*, the Tenth Circuit held, first, that an employee's speech *was* protected under the First Amendment.  *Casey*, 473 F.3d at 1333–34.

So, the court explained, "[i]t has long been established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action." *Id.* (first citing *Paradis v. Montrose Mem'l Hosp.*, 157 F.3d 815, 818–19 (10th Cir. 1998); then citing *Considine v. Bd. of Cnty. Comm'rs of Cnty. of Adams*, 910 F.2d 695, 700 (10th Cir. 1990)).

Plaintiff argues the issue with defendants' "approach is that [their] conclusion is dependent upon the Court finding facts in favor of Defendant Evans, something which the [c]ourt is not permitted to do on a motion to dismiss." Doc. 26 at 15. The court agrees with him about the governing legal standard, but not about the outcome that follows from this standard. Here, the court has viewed the facts alleged in plaintiff's Amended Complaint in plaintiff's favor, as Fed. R. Civ. P. 12(b)(6) demands. The court hasn't assumed any facts in Sheriff Evans's favor. Based on the facts alleged in plaintiff's Amended Complaint—and construing them in his favor—he hasn't alleged plausibly that his constitutional rights were violated.

This case isn't like *Casey*. There, the plaintiff spoke "as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so," which meant her "employer [could] not take retaliatory action." *Casey*, 473 F.3d at 1333–34 (citations omitted). Here, even construing plaintiff's allegations in his favor, he spoke (1) as a government employee (2) on matters that weren't ones of public concern (3) in a job-related capacity, and (4) only to individuals within his chain of command.

*Casey* doesn't help his case. In the absence of a plausible claim for violations of the First or Fourteenth Amendment, defendant Sheriff Evans deserves qualified immunity against plaintiff's § 1983 claims.

### D.  The Court Will Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims, Under 28 U.S.C. § 1367

31

### 1.  Legal Background

In addition to his federal allegations, plaintiff asserts three state law claims.  *See* Doc. 5 at 6–8 (Am. Compl. ¶¶ 45–60).  According to plaintiff, defendants are liable for:  (1) "Whistleblower retaliation in violation of public policy[,]" (2) "Tortious interference with prospective contractual relationships and expectancy[,]" and (3) "Blacklisting[.]"  *See id.* Responding to defendants' Motion to Dismiss, plaintiff asserts the court "currently has supplemental jurisdiction over Plaintiff's state law claims."  Doc. 26 at 35 (citing 28 U.S.C. § 1367).  He's right.  That statute provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

District courts don't fly blind when they make the decision whether to exercise supplemental jurisdiction.  Instead, several factors guide the inquiry.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (instructing federal district courts—when considering whether to exercise supplemental jurisdiction—to consider "the values of judicial economy, convenience, fairness, and comity"); *see also Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Our Circuit also has expressed the *preference* that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims.  *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)

("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)).  Still, the decision is committed to the district court's sound discretion.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

In this Order, the court already has concluded that plaintiff's federal claims fail as a matter of law because he failed to allege facts capable of supporting a plausible finding or inference that plaintiff has stated a claim for which he is entitled to relief, under Fed. R. Civ. P. 12(b)(6).  Typically, this finding would end the court's inquiry because it would make it more appropriate for a state court to decide plaintiff's remaining claims.  This inclination is informed by the requirement that the court consider notions of fairness and comity, among others.  *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.

Yet, the court can't decline supplemental jurisdiction in this case—at least not without first addressing a novel holding by the Kansas Supreme Court.  *See Stanfield v. Osborne Indus., Inc.*, 949 P.2d 602 (Kan. 1997); *see also Rhoten v. Dickson*, 223 P.3d 786 (Kan. 2010).  Twice, the state's supreme court has ruled that a plaintiff may not pursue refiled state law claims in state court after a federal district court—having dismissed all federal claims—has declined to exercise supplemental jurisdiction over those state law claims.  *Id.*  In both cases, the federal district court had dismissed the state law claims without prejudice.  *Id.*

Plaintiff acknowledges this Kansas rule.  Doc. 26 at 35–36.  And, because of it, he asks the court to retain his state law claims—by exercising its supplemental jurisdiction—even if the court dismisses all federal claims.  *Id.* at 36.  Defendants advocate for the opposite outcome.  *See* Doc. 31 at 23.  They say "plaintiff cited no authority in support of his conclusion that the mere possibility of claim preclusion in state court is an appropriate consideration for this Court in

33

making its determination on whether to retain jurisdiction." *Id.*  But the court agrees with plaintiff for several reasons—and not just because of the Kansas rule on claim preclusion.

*First* (and in no particular order), the court must consider whether fairness favors exercising supplemental jurisdiction or declining it.  *See Carnegie-Mellon Univ.*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.  It hardly seems fair that plaintiff's state law claims could face certain doom on the basis of a novel Kansas rule permitting defendants to invoke claim preclusion regardless of whether *any* court considered plaintiff's claims.  *See Stanfield*, 949 P.2d at 612–13 (holding a "legal theory does not even need to be raised in the first action, more or less considered by the court, in order for it to be precluded in a later action under the claim preclusion doctrine").  Plus, the parties have fully briefed their arguments on these state law claims.  *See* Doc. 12 at 19–40 (Defs.' Mem. Supp. Mot. Dismiss), Doc. 26 at 15–36 (Pl.'s Mem. Opp'n to Defs.' Mot. Dismiss), Doc. 31 at 8–23 (Defs.' Reply Supp. Mot. Dismiss).  So—between these two choices— *i.e.*, exercising or declining supplemental jurisdiction, it seems unfair in *this* context to decline supplemental jurisdiction.

*Second*, and given the parties' robust debate on these state law claims, judicial economy and convenience are both benefitted if the court accepts supplemental jurisdiction.  *See Carnegie-Mellon Univ.*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.  The court already has everything it needs, in this case, to rule plaintiff's state law claims.  The parties have argued them vigorously and effectively.  And, as the next portion of this Order explains, the controlling state law is settled.  Thus, it would waste everyone's time and resources to send the parties packing to a state court where they would have to perform the same work again—for a judge new to the scene (if the state court judge entertains plaintiff's state law claims at all, given the *Stanfield* and *Rhoten* rule).  This court is prepared to rule plaintiff's state law claims.

*Third*, and building on the court's analysis of the foregoing factors, comity won't be offended by the court exercising supplemental jurisdiction in this case.  For one thing, the rule in *Stanfield* and *Rhoten* appears to ask as much of this court.  The logic in those two cases—each of them from the Kansas Supreme Court—effectively encourages federal courts to exercise supplemental jurisdiction.  Likewise, at least one state court judge has expressed displeasure at the sight of federal courts who decline supplemental jurisdiction.  *See Herrington v. City of Wichita*, No. 17-CV-1553, 2018 WL 11277644, at *4 n.2 (Kan. Dist. Ct. Aug. 31, 2018) ("[I]t is puzzling why federal courts routinely refuse to exercise [supplemental] jurisdiction to resolve state law claims when such courts make findings of fact that effectively dictate the resolution of those [state law] claims.").  The views implied by (and expressed in) Kansas state courts don't displace the prevailing standard of our Circuit, of course.  *See Wittner*, 720 F.3d at 781.  And, this court doesn't agree that federal courts—in every case—should exercise supplemental jurisdiction.  But, in this case, that outcome makes the most sense.

*Last*, plaintiff asks the court to invoke its supplemental jurisdiction.  Doc. 26 at 36.  The state law claims rely on the same factual allegations used to support plaintiff's federal claims.  The parties have briefed fully their arguments on these claims.  *See* Doc. 12 at 19–40 (Defs.' Mem. Supp. Mot. Dismiss), Doc. 26 at 15–36 (Pl.'s Mem. Opp'n to Defs.' Mot. Dismiss), Doc. 31 at 8–23 (Defs.' Reply Supp. Mot. Dismiss).  And, state law is clear about how things shake out.  So, having considered the factors described by the Supreme Court in *Carnegie-Mellon Univ.*, 484 U.S. at 350, and by the Tenth Circuit in *Wittner*, 720 F.3d at 781, the court concludes that exercising its supplemental jurisdiction, under 28 U.S.C. § 1367, is appropriate in this case.[6]

---

[6]    "This case" is an operative phrase carrying technical meaning here.  The court does not plan to invoke supplemental jurisdiction in all cases that meld common facts into a mix of federal and state claims.  Instead, the court will approach every case before it involving state law claims as its own entity, which Supreme Court and Tenth Circuit precedent requires.  *See id.*

Now, the court turns to plaintiff's Kansas state law claims.  A federal court exercising supplemental jurisdiction over state law claims in a federal question lawsuit applies the substantive law, including choice of law rules, of the forum state.  *BancOklahoma Mortg. Corp. v. Cap. Title Co., Inc.*, 194 F.3d 1089, 1104 (10th Cir. 1999) (citations omitted).  Here, Kansas is the forum state.  For plaintiff's state law claims—each of them based on tort theories—Kansas courts apply the "law of the 'place of the wrong.'"  *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1445 (D. Kan. 1995).  "The 'place of the wrong' is that place where the last event necessary to impose liability took place.'"  *Id.*  In this case, the place of the last event necessary to impose liability against defendants was Kansas, so Kansas law governs.  Plus, the parties never dispute that Kansas law governs plaintiff's state law claims against defendants.  Kansas is the forum state, the parties have identified the relevant Kansas statutes, and the court agrees with the parties.  Kansas law applies.

### 2.  Plaintiff's Count I:  Whistleblower Retaliation in Violation of Public Policy

Plaintiff's Count I is a claim for "whistleblower retaliation in violation of public policy[.]"  Doc. 5 at 6–7 (Am. Compl. ¶¶ 45–50).  In plaintiff's view, his reports to superiors about the misconduct alleged in his Amended Complaint are protected activity under state law.  *See* Doc. 26 at 34–35.  Defendants disagree for more than one reason, but the court needn't recount them all.  At least one of them controls this claim's outcome.  *See* Doc. 12 at 37–38; *see also* Doc. 31 at 22.

"At-will employment is the general rule in Kansas."  *Merkel v. Leavenworth Cnty. Emergency Med. Servs.*, No. 98-2335-JWL, 2000 WL 127266, at *12 (D. Kan. Jan. 4, 2000) (citing *Flenker v. Willamette Indus., Inc.*, 967 P.2d 295, 298 (Kan. 1998)).  However, Kansas

courts recognize certain public policy exceptions to this general rule.  *Id.* (citing same).  "One

such exception is commonly referred to as the 'whistleblower' exception."  *Id.* (citing same).

The exception for whistleblowers was "first announced in *Palmer v. Brown*."  *Id.* (citing

*Palmer*, 752 P.2d 685 (Kan. 1988)).  In *Palmer*, the Kansas Supreme Court declared "no

hesitation in holding termination of an employee in retaliation for the good faith reporting of a

serious infraction of such rules, regulations, or the law by a co-worker or an employer to either

company management or law enforcement officials (whistle-blowing) is an actionable tort."

*Palmer*, 752 P.2d at 689–90.  Here, plaintiff alleges he was terminated for blowing the whistle on

policy failures and legal malfeasance by his colleagues.  *See* Doc. 5 at 2–7 (Am. Compl. ¶¶ 7–

50).  So far so good.

Twenty-one years ago, Judge Lungstrum of our court explained the interplay between the

whistleblower exception and another important doctrine in Kansas:  the presence of an "adequate

alternative remedy."  *Merkel*, 2000 WL 127266, at *12.  He explained, in "*Polson v. Davis*, the

Tenth Circuit held that the Kansas Supreme Court would not allow a common law cause of

action for retaliatory discharge when an adequate statutory remedy exists under Kansas law."  *Id.*

(citing *Polson*, 895 F.2d 705, 709–10 (10th Cir. 1990)).  On top of that, the Tenth Circuit

"expressly held that the *Polson* rationale extends to plaintiffs seeking to assert a common law

cause of action for retaliation when they have a federal statutory right."  *Id.* (citation omitted).

The Kansas Supreme Court has confirmed that *Polson* accurately perceived Kansas law.  *See*

*Flenker*, 967 P.2d at 303 ("*Polson* was correct in surmising the Kansas rule to be that an

adequate alternative remedy precludes a common-law retaliatory discharge action.").

In *Merkel*, the plaintiff made a First Amendment claim under § 1983 and a Kansas state

law claim for retaliatory discharge.  *Merkel*, 2000 WL 127266, at *11 ("[P]laintiff asserts a state

law retaliatory discharge claim on the same factual basis as his First Amendment claim[.]"). Here, plaintiff invokes a similar strategy. He alleges a Kansas retaliatory discharge claim using the same facts he alleges to support his First Amendment claim under § 1983. *See* Doc. 5 at 2–7, 9–10 (Am. Compl. ¶¶ 7–50, 69–81). *Merkel* concluded that "section 1983 clearly provide[d] an alternative vehicle for plaintiff to pursue any injuries stemming from his alleged retaliatory discharge." *Merkel*, 2000 WL 127266, at *12. So, Judge Lungstrum granted summary judgment against plaintiff's retaliatory discharge claim because plaintiff possessed an adequate alternative remedy. *Id.*

Judge Lungstrum's review of these legal dynamics illuminates the correct analysis here. So does his ruling in *Tollen v. City of El Dorado, Kan.*, No. 11-1182-JWL, 2012 WL 10353, at *1 (D. Kan. Jan. 3, 2012) (reasserting that *Polson* controls the issue, in line with Kansas Supreme Court precedent, because "the Kansas Supreme Court would not allow a common law cause of action for retaliatory discharge when an adequate statutory remedy exists" under either Kansas state law or "a federal statutory right"). Finally, the Kansas Supreme Court agrees. *See Flenker*, 967 P.2d at 303 ("*Polson* was correct in surmising the Kansas rule[.]"). Even assuming all facts plaintiff alleges are true, the court can't envision a path for him to succeed under the state's whistleblower exception. To the contrary, precedent from the Kansas Supreme Court "precludes a common-law retaliatory discharge action" under these circumstances because plaintiff had "an adequate alternative remedy" with his asserted § 1983 claim. *Id.*

In sum, even when the court assumes all of plaintiff's allegations are true, plaintiff fails to "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff's claim for whistleblower retaliation isn't plausible because he already has an adequate alternative remedy in the form of a § 1983 action. And under settled Kansas law, the existence of that

alternative remedy precludes a retaliation claim based on whistleblowing.  The court thus dismisses Count I's claim with prejudice.

### 3.  Plaintiff's Count II:  Tortious Interference with Prospective Contractual Relationships or Expectancy

Plaintiff's second state law claim alleges he "had the expectancy of a prospective contractual relationship in the form of employment with other law enforcement agencies with the probability of future economic benefit[.]"  Doc. 5 at 7 (Am. Compl. ¶ 52).  The Rice County Sheriff's Office knew of this expectancy, he alleges.  *Id.* (Am. Compl. ¶ 53) ("The Defendant Sheriff's Office knew, or had constructive knowledge, of the prospective expectancy of the Plaintiff's employment with other law enforcement agencies.").  But for the Rice County Sheriff's office's involvement, plaintiff alleges he was "reasonably certain to have realized the expectancy of employment with another law enforcement agency."  *Id.* (Am. Compl. ¶ 54).  In plaintiff's view, these facts plausibly allege a common law cause of action for tortious interference with prospective contractual relationships or expectancy.  *Id.* at 7 (Am. Compl. ¶¶ 51–54).

Not so fast, defendants say.  They argue at least two independent reasons foreclose plaintiff's claim as a matter of law.  *First*, they contend, plaintiff's claim rests on the KS-CPOST report that Sheriff Evans drafted after plaintiff was terminated.  Doc. 12 at 19.  But, "no liability whatsoever can arise from those reports under Kansas law."  *Id.*  Defendants are right.  *Second*, defendants alternatively argue that "the true nature of Plaintiff's claim is not one of tortious interference, but defamation."  *Id.* at 21.  This matters, they contend, because a tortious interference claim, under Kansas law, is subject to a two-year statute of limitation, and defamation claims only get one year.  *Id.*  Plaintiff filed suit more than one year after Sheriff

Evans submitted the KS-CPOST report.  Again, defendants are correct.  In subsections a. and b., following, the court explains both conclusions in more detail.

### a.  Defendants are absolutely immune from civil liability under Kansas state law.

First, defendants premise their Motion to Dismiss—as relevant here—on an argument that Kansas state law immunizes them from civil liability.  *See, e.g.*, Doc. 12 at 21 ("Defendants are absolutely immune from these claims." (internal quotation marks omitted)).  How so?

According to plaintiff's allegations, Sheriff Evans prepared and submitted his KS-CPOST report the day after plaintiff's employment was terminated—in January 2018.  *See* Doc. 5 at 5 (Am. Compl. ¶ 36).  It provided, according to plaintiff's Amended Complaint, false justifications for his termination.  *Id.*  The report asserted plaintiff "had been insubordinate . . . 'failed to adhere to Policies and Procedures,' was very defiant and argumentative when directed to make corrections to his reports . . . [and] caused turmoil with the office."  *Id.*  Plaintiff's central allegation in his lawsuit is that he *actually* was fired in retaliation for raising concerns about misconduct at the Sheriff's Office.  *See generally* Doc. 5 (Am. Compl.).

Even assuming he's right, a Kansas statute grants immunity to defendants from civil liability in this context.  It only takes two steps to reach this conclusion.  *First*, when Sheriff Evans submitted his report to KS-CPOST, he did so because the law required it.  *See* Kan. Stat. Ann. § 74-5611a(d).  Specifically, this statute provides:

> Upon termination, the agency head shall include a report explaining the circumstances under which the officer resigned or was terminated. Such termination report shall be available to the terminated officer and any law enforcement agency to which the terminated officer later applies for a position as a police officer or law enforcement officer. The terminated officer may submit a written statement in response to the termination and any such statement shall be included in the registry file concerning such officer.

*Id.* *Second*, the same statute promises that the "agency, agency head and any officer or employee of the agency shall be absolutely immune from civil liability . . . [f]or the report made in accordance with subsection (d)[.]" Kan. Stat. Ann. § 74-5611a(e)(1).

Sheriff Evans submitted a report to KS-CPOST "explaining the circumstances under which the officer resigned or was terminated." Kan. Stat. Ann. § 74-5611a(d). So, both he *and* "the agency . . . and any other officer or employee of the agency shall be absolutely immune from civil liability" for "the report made in accordance with subsection (d)[.]" Kan. Stat. Ann. § 74-5611a(e)(1).

Plaintiff alleges the *contents* of Sheriff Evans's report were false. *See* Doc. 5 at 5 (Am. Compl. ¶ 36). The court assumes—as it must under Fed. R. Civ. P. 12(b)(6)—that plaintiff is right, but still agrees with defendants. The Kansas statute requiring the Sheriff's report to KS-CPOST explicitly confers absolute immunity from civil liability based on the report. Kan. Stat. Ann. § 74-5611a(e)(1). Absolute means absolute. The statute's promise of "absolute[]" immunity subsumes even the possibility that the report contained false or misleading statements. *Id.* As a matter of law, plaintiff can't sue defendants on the basis of the KS-CPOST report, at least not in this context. And, that's exactly what Count II tries to do.[7]

One last argument warrants a brief rejoinder. Plaintiff argues his tortious interference claim must survive because this immunity statute wasn't on the books when defendants fired him. Doc. 26 at 17–18 (describing "a complete overhaul" of the relevant statutes which

---

[7]     Separately, plaintiff argues his state law blacklisting claim is viable because one Kansas state court has held the pertinent statute didn't intend to protect employers who report false information about terminated employees, such as through the KS-CPOST report in this case. Doc. 26 at 30–31 (citing *Rowland v. U.S.A. 800, Inc.*, No. 14-CV-12 (Kan. Dist. Ct. Feb. 17, 2015). Its logic is similar to plaintiff's argument here, but also distinguishable for two reasons. First, plaintiff chose not to argue this case as it applies to absolute immunity for tortious interference. Second, *Rowland* exclusively addressed the Kansas blacklisting statute. It did not address a claim based on tortious interference. *See id.* For these reasons, the court doesn't apply *Rowland* to plaintiff's tortious interference claim.

"repealed the previous version" and resulted in "[t]he subsection pertaining to immunity"

appearing for the first time in 2018). This is simply wrong. The same language appears in prior

versions of the legislation that were in effect for the entirety of plaintiff's employment with the

Rice County Sheriff's Office. *See* Kan. Stat. Ann. § 74-5611a(e)(1) (West 2017). So, the court

dismisses Count I because defendants are immune from liability on this claim.

### b. Plaintiff's tortious interference claim is really a defamation allegation, and it's barred by the relevant statute of limitations.

Next, defendants argue a separate basis requires dismissal of Count II. That is,

"Plaintiff's 'tortious interference' claim is, in reality, a defamation claim that is subject to a one-

year statute of limitations." Doc. 12 at 21. Plaintiff disagrees, Doc. 26 at 19–20, but defendants

are right. The court will explain.

At first blush, defendants' argument sounds a bit strained. In effect, they ask the court to

set aside the legal theory plaintiff chose to frame his allegations in favor of defendants'

characterization of that claim. However, their point finds strong support in state and federal

precedent.

Looking to Kansas state courts first, there's *Taylor v. International Union of Electronic,*

*Electrical, Salaried, Machine and Furniture Workers*, 968 P.2d 685 (Kan. Ct. App. 1998).

*Taylor* involved a former union organizer for defendant, who later terminated the organizer's

employment. *Id.* at 687. Afterward, defendant sent a letter to employees at a manufacturing

facility where a separate union was aiming to establish a local chapter. *Id.* They did so,

allegedly, because the terminated organizer—plaintiff—hoped to secure work from the other

union. *Id.* Plaintiff alleged the letter contained false statements amounting to tortious

interference with prospective contractual opportunities. *Id.* at 687–88. Indeed, the second union

sent plaintiff a letter explaining it had decided to terminate discussions with plaintiff based on

information provided to them, which related to the contents of that letter.  *Id.*  So, he sued, and framed his cause of action as "one for tortious interference with a prospective business advantage."  *Id.*

The Kansas trial court rejected plaintiff's tortious interference claim.  *Id.* at 688.  It reasoned that plaintiff had framed the case as one involving tortious interference and, under this view, the claim had accrued within the two-year statutory limitations period for such a claim.  *Id.* (citing Kan. Stat. Ann. § 60-513(a)(4)).  In contrast, however, a claim "for defamation must be brought within 1 year."  *Id.* (citing Kan. Stat. Ann. 60-514(a)).  And, more than one year had passed between the alleged unlawful conduct and plaintiff's lawsuit.  *Id.*

*Taylor* affirmed and explained why.  "The law is clear in Kansas that the courts will look through form to substance in determining the true nature of a cause of action."  *Id.* at 690.  This premise produces a general rule for Kansas courts.  *Id.*  That is, "'plaintiff will not be permitted to characterize a tort action as one in contract in order to avoid the bar of the statute of limitations or governmental immunity.'"  *Id.* (quoting *Malone v. Univ. of Kan. Med. Cetr.*, 552 P.2d 885, 889 (Kan. 1976)).

This view is not confined to state court cases.  The Tenth Circuit has reached the same conclusion.  *See Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996 (10th Cir. 2002).  In *Sports Unlimited*, the Circuit was asked to reject what the Kansas court, in *Taylor*, had decided.  *Id.* at 1000.  Instead, the Tenth Circuit held that the district court correctly had determined "that the federal court should follow *Taylor* as an authoritative indication of Kansas law on the limitations issue."  *Id.*

This court thus will follow *Taylor*.  Here, plaintiff's allegation turns on the contents of the KS-CPOST report.  In other words, he alleges not only that the report was false in what it

stated, but that its falsity functioned to limit his future professional opportunities.  *See* Doc. 5 at 7 (Am. Compl. ¶¶ 51–54).  If the report contained truthful comments on the reasons for his termination, plaintiff wouldn't have an argument.  That's no different than a defamation claim.

Plaintiff alleges defendants *harmed* him by sending a false writing about him to a law enforcement consortium, which, because it was false, eliminated future job opportunities with other agencies.  The court can't find a reason to distinguish this case from *Taylor*—and plaintiff has provided no persuasive reason for the court to do so.  *See Taylor*, 968 P.2d at 691.  "In the final analysis, the success of plaintiff's lawsuit rests on whether the statements in the letter are true or false."  *Id.*  The same is true for plaintiff here.  "Plaintiff does not deny that his tortious interference claim is based on alleged defamatory comments in the [defendant's] letter."  *Id.*  Again, the court's observations in *Taylor* ring true in this case.

Having concluded that plaintiff's tortious interference claim is, in fact, one sounding in defamation, the court turns to the statute of limitations governing those claims.  Under Kansas law, a plaintiff must bring a defamation action within one year's time of the alleged defamatory conduct.  Kan. Stat. Ann. § 60-514(a).  Here, the alleged defamatory conduct occurred on January 19, 2018.  Doc. 5 at 5 (Am. Compl. ¶ 36) (stating "[i]n a January 19, 2018 report to the [KS-CPOST], Sheriff Evans wrote falsely" about the reasons for plaintiff's firing).  Plaintiff filed his original complaint in this court on December 19, 2019.  *See* Doc. 1 (Compl.).  Longer than one year expired before plaintiff filed this cause of action.  Accordingly, it's foreclosed by the governing statute of limitation.  *See* Kan. Stat. Ann. § 60-514(a).  The court thus grants defendants' Motion to Dismiss on Count II for this alternative, independent reason.

### 4.  Plaintiff's Count III:  Blacklisting

Plaintiff's third and final state law allegation involves "blacklisting," which the relevant

Kansas statute defines to mean:

> Any employer of labor in this state, after having discharged any person from his service, shall not prevent or attempt to prevent by word, sign or writing of any kind whatsoever any such discharged employee from obtaining employment from any other person, company or corporation, except by furnishing in writing, on request, the cause of such discharge.

Kan. Stat. Ann. § 44-117.  Adjacent to this statute, Kansas law also provides a civil cause of

action for blacklisting.  *See* Kan. Stat. Ann. § 44-119.  It provides:

> Any person, firm or corporation found guilty of the violation of this act, shall be liable to the party injured to an amount equal to three times the sum he may be injured, and such employers of labor shall also be liable for a reasonable attorney fee, which shall be taxed as part of the costs in the case.

*Id.*  Plaintiff alleges defendants blacklisted him by making false statements in the report

submitted to KS-CPOST about the reasons for his firing.  *See* Doc. 5 at 7–8 (Am. Compl. ¶¶ 55–

60).  Of course, defendants disagree.  From there, the parties' arguments spiral toward the canons

of statutory interpretation.  Fortunately for readers, but less so for plaintiff, an unrelated reason

controls on this issue and requires dismissal.

Plaintiff's blacklisting claim under Kansas law is barred by the applicable statute of

limitations.  *See* Kan. Stat. Ann. § 60-514(c) (explaining an "action upon statutory penalty or

forfeiture" must "be brought within one year").  As outlined in the court's analysis of Count II,

defendants argue the report to KS-CPOST was submitted more than a year before plaintiff filed

suit.  *See* pp. 44, above (explaining Sheriff Evans submitted the KS-CPOST report in January

2018 and plaintiff filed suit in December 2019).  The issue and solution is clear.  Kan. Stat. Ann.

§ 60-514(c) bars plaintiff from asserting a plausible claim for blacklisting.

This conclusion is nothing new.  In 1994, our court addressed this exact issue.  *See*

*Harris v. City of Russell, Kan.*, No. 93-1071-PFK, 1994 WL 240759, at *10 (D. Kan. May 13,

1994).  In *Harris*, plaintiff "advanced a number of state law claims," including blacklisting under

Kan. Stat. Ann. § 44-117.  *Id.*  First, the court sided with the Tenth Circuit's ruling in *Anderson*

*v. United Telephone Co. of Kansas*, 933 F.2d 1500 (10th Cir. 1991) for the premise that this

"cause of action requires an underlying criminal conviction . . . but there is admittedly no

underlying conviction here."  *Id.*  To that point, the parties in the instant action disagree with

great enthusiasm.  *Compare* Doc. 12 at 36 (arguing plaintiff's "cause of action is only viable

*after* the criminal conviction of a former employer" and citing *Anderson* as support) *with* Doc. 26

at 30–33 (arguing "*Anderson* should be overruled" and citing *Rowland* in support).  If this was

all the court had to consider, it's unlikely that defendants could prevail on a Rule 12(b)(6)

standard.

But, that's not all the court has before it.  In *Harris*, this court also observed that

plaintiff's claim was doomed regardless because "such a claim would be subject to, and barred

by, the one year statute of limitations under" Kan. Stat. Ann. § 60-514(c).  *Harris*, 1994 WL

240759, at *10.  That's precisely what defendants argue in this case.  Doc. 12 at 23 ("The one-

year statute of limitations at [Kan. Stat. Ann. §] 60-514 clearly applies here." (citing *Harris*,

1994 WL 240759, at *10)).

Plaintiff didn't refute the holding in *Harris* in his Response to defendants' Motion to

Dismiss.  Instead, he argues the "correct analysis for determining the answer to this question is

found in *McCormick v. City of Lawrence*."  Doc. 26 at 20 (citing *McCormick v. City of*

*Lawrence*, 104 P.3d 991 (Kan. 2005)).  *McCormick* offers an analogy—at best—and certainly no

clear statement on the point presently before the court.  *See McCormick*, 104 P.3d at 991–92

(explaining plaintiff "sued the City of Lawrence . . . and various police officers for violating the

strip and body cavity search statutes" in Kansas).  Defendants, on the other hand, have identified

clear precedent on the issue of statutory time limits for this specific claim.  The court doesn't need to strain logic when case law speaks clearly and decisively on this issue.

*Harris* doesn't stand on its own, either.  Just last year, United States Magistrate Judge Mitchell reached the same conclusion.  *See Painter v. Midwest Health, Inc.*, No. 19-2336-DDC-ADM, 2020 WL 5016878, at *4 (D. Kan. Aug. 25, 2020).  As in *Harris*, Judge Mitchell, in *Painter*, addressed whether plaintiff could amend her complaint to assert an alleged incident of retaliatory discharge and an allegation of blacklisting, asserted under Kan. Stat. Ann. § 44-117. *Id.*  In keeping with *Harris*, Judge Mitchell concluded that a "claim for blacklisting in violation of Kan. Stat. Ann. § 44-117 is subject to a one-year statute of limitations."  *Id.* (first citing Kan. Stat. Ann. § 60-514(c) (requiring that "an action upon statutory penalty or forfeiture" must be brought within one year); then citing *Harris*, 1994 WL 240759, at *10 (explaining that a blacklisting claim "would be subject to . . . the one year statute of limitations under" Kan. Stat. Ann. § 60-514(c))).

As in *Painter* and *Harris*, plaintiff here filed his blacklisting claim more than one year after the conduct at issue occurred—*i.e.*, his termination and the KS-CPOST report's submission. *See Painter*, 2020 WL 5016878, at *4 (explaining plaintiff's termination and related employer conduct occurred more than one year before plaintiff raised her blacklisting claim); *Harris*, 1994 WL 240759, at *10 (explaining same).  And so, as in *Painter* and *Harris*, the court concludes the one-year statute of limitations period established under Kan. Stat. Ann. § 60-514 bars plaintiff's claim here.  *See id.*

Plaintiff's blacklisting claim is time-barred.  The court dismisses it for failure to state a plausible claim for relief.

**IV.    Conclusion**

The court grants defendants' Motion to Dismiss against all of the claims plaintiff asserts under federal law (including those based on the United States Constitution) as well as his state law claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 11) is granted;

**IT IS FURTHER ORDERED THAT** all claims in plaintiff's Amended Complaint (Doc. 5) are dismissed with prejudice;

**ACCORDINGLY, IT IS FURTHER ORDERED THAT** plaintiff's Motion for Leave to File Second Amended Complaint and to Substitute Party (Doc. 27) is denied;

**AND, IT IS FURTHER ORDERED THAT** plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 34) is denied.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**